# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 1:25-cv-24137-DPG

INDEPENDENT PURCHASING
COOPERATIVE, INC.,

        Plaintiff,

v.

JANET RISI,
DENNIS CLABBY,
JOSE FERNANDEZ,
DIVERSIFIED RESTAURANT SYSTEMS, INC.,
DANIEL SPINAZZOLA,
MICHAEL SPINAZZOLA,
WEST LIBERTY FOODS, LLC,
LINEAGE, INC.,
CRAFTMARK BAKERY, LLC
ROBERT CHENEY,
CAMILLE FOURNIER,
GEORGIA PACIFIC, LLC, AND
ECOLAB, INC.,

        Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff Independent Purchasing Cooperative, Inc. ("IPC"), on behalf of thousands of quick-service-restaurant chain franchisees in the United States, Canada, Puerto Rico, the U.S. Virgin Islands, and Guam, sues Defendants Janet Risi, Dennis Clabby, Jose Fernandez, Diversified Restaurant Systems, Inc., Daniel Spinazzola, Michael Spinazzola, West Liberty Foods, LLC, Lineage, Inc., Craftmark Bakery, LLC, Robert Cheney, Camille Fournier, Georgia Pacific LLC, and Ecolab Inc. (together, the "Defendants") and alleges:

## NATURE OF THE CASE

1.      Plaintiff IPC is the independent purchasing and supply chain cooperative responsible for negotiating master purchase contracts for goods and services that IPC's Members need to operate their quick-service-restaurant franchises.

2.      Defendant Janet Risi, the founder and former CEO and President of IPC, conspired with Defendants Daniel Spinazzola, Michael Spinazzola, Robert Cheney, Camille Fournier, Jose Fernandez, and Dennis Clabby to defraud IPC and IPC's Members of over $200 million through complex "pay-to-play" kickback schemes that lasted for decades.

3.      Under these kickback schemes, Defendants Janet Risi, Daniel Spinazzola, Michael Spinazzola, Robert Cheney, and Camille Fournier solicited and accepted improper payments from certain IPC vendors—specifically, Defendants West Liberty Foods, LLC, Lineage, Inc., Craftmark Bakery, LLC, Georgia Pacific LLC, and Ecolab Inc. (collectively, the "Vendor Defendants"). In return for these illicit payments, the Vendor Defendants secured and retained lucrative contracts to supply goods and services to IPC's Members. Through quid pro quo arrangements, millions of dollars in kickbacks were funneled back to Risi and her co-conspirators, and in exchange, the Vendor Defendants received billions of dollars in revenue under contracts that Risi orchestrated and ensured were awarded to them.

4.      To effectuate the complex fraudulent schemes, Defendants Janet Risi, Daniel Spinazzola, Michael Spinazzola, Robert Cheney, and Camille Fournier used other entities—specifically Defendant Diversified Restaurant Systems, Inc., non-party Technical Food Solutions, Inc., and non-party Southwest Re-Distribution Company, Inc.—to disguise kickback payments made by the Vendor Defendants as "fees" or "commissions." These charges had no legitimate business purpose. Instead, these "fees" or "commissions" were fabricated solely to make the illicit payments appear legitimate in order to conceal the unlawful kickback scheme.

5.      After receiving the sham "fees" and "commissions," Defendant Diversified Restaurant Systems, Inc., non-party Technical Food Solutions, Inc., and non-party Southwest Re-Distribution Company, Inc., funneled the illicit payments to Defendants Janet Risi, Daniel Spinazzola, Michael Spinazzola, Robert Cheney, and/or Camille Fournier, who collectively reaped millions of dollars in unlawful gains.

6.      The Vendor Defendants passed the cost of the kickback payments onto IPC's Members by artificially inflating the prices of the products and services the Vendor Defendants sold to IPC's Members.

7.      Defendants Janet Risi, Dennis Clabby, and Jose Fernandez used their executive positions at IPC to intentionally conceal the complex fraudulent kickback schemes from IPC's Members and IPC's Board of Directors. In doing so, Defendants Janet Risi, Dennis Clabby, and Jose Fernandez acted for their own personal and financial benefit while abandoning their fiduciary obligations to, and acting entirely adverse to the interests of, IPC and IPC's Members.

8.      As a result of the harms suffered by IPC and IPC's Members due to Defendants' conduct, IPC brings this action alleging claims for Florida Civil Remedies for Criminal Practices Act (Fla. Stat. §772.103(3)) ("Florida Civil RICO"), Conspiracy to Violate Florida Civil RICO

(Fla. Stat. §772.103(4)), Fraud, Fraudulent Inducement, Breach of Contract, Breach of Fiduciary Duty, Aiding and Abetting Fraud, Aiding and Abetting Breach of Fiduciary Duty, Unjust Enrichment, and Violation of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

## THE PARTIES

9.      Plaintiff IPC is an independent, not-for-profit, member-owned purchasing cooperative incorporated under the laws of the state of Delaware, with its principal place of business located in Miami, Florida. IPC is owned by its members, who are Subway® franchisees in the United States, Canada, Puerto Rico, the U.S. Virgin Islands, and Guam.

10.      IPC is a distinct and independently operated corporate entity, separate from Subway and its affiliated companies. IPC does not own, operate, control, or participate in Subway's brand management, marketing activities, or franchise system. IPC has no role in Subway's franchise agreements. IPC's sole connection to Subway is its appointment to perform certain supply-chain management services for the benefit of Subway franchisees.

11.      IPC operates as an agent for its members, the Subway franchisees in the United States, Canada, Puerto Rico, the U.S. Virgin Islands, and Guam ("IPC's Members") by negotiating and entering into contracts with vendors on behalf of and for the benefit of IPC's Members for products and services that are required to operate Subway restaurants, including food, beverages, packaging, supplies, equipment, and related logistics and distribution services. For example, IPC negotiates master contracts with vendors for products, including: produce; protein (turkey, bacon, ham, chicken, sausage, meatballs, and roast beef); baked goods; dairy; sauces; equipment; packaging; beverages; and cleaning supplies. IPC also negotiates contracts with the national and regional distribution and redistribution companies, as well as the freight and logistics companies, who make products available for IPC's Members to purchase for their individual restaurants.

12.     IPC leverages the size and scale of the North America Subway system—derived from the combined purchasing volume of all of IPC's Members—to negotiate master supply contracts with vendors for the benefit of IPC's Members. By negotiating centralized master agreements with product and service vendors, IPC has established a reliable supply chain for franchisees while reducing costs for its Members through a strategic approach to sourcing supplies, equipment, logistics, and related services.

13.     On average, an IPC Member owns two Subway restaurants. These independently owned franchises have been described as the ultimate mom-and-pop stores, which are woven into the fabric of their respective local communities. By leveraging the collective purchasing power of all the franchisees, each individual franchisee benefits from reduced supply chain costs and better deals with vendors.

14.     To manage inventory and facilitate the flow of products from vendors, IPC uses a series of distribution and redistribution centers. Redistribution centers typically warehouse slower moving, lower volume products and "break bulk" them, which allows the redistribution centers to deliver smaller quantities of those products to distribution centers, resulting in logistics savings and reduced product waste. Distribution centers purchase products either directly from vendors or from redistribution companies and then supply those products to IPC's Members for purchase by their individual restaurants. Distribution centers invoice IPC's Members for the products that IPC's Members purchase. The vendors' prices for their products are passed directly through the distribution centers to IPC's Members. The fees that redistribution companies charge for their services also are passed directly through the distribution centers to IPC's Members in the product price.

15.     Consistent with standard cooperative practice, IPC assesses a fee on products sold by approved vendors. This fee is fully disclosed to IPC's Members and vendors, but it is the franchisees, through their purchase of those products, who ultimately pay the fee. IPC uses those funds solely to cover its operating expenses, and any revenues remaining thereafter are distributed to IPC's Members as an annual patronage dividend.

16.     IPC's Members irrevocably and unconditionally assign to IPC all rights, authority, control, and interest in claims, including without limitation all rights to pursue these causes of action.

17.     IPC brings this action as the real party in interest on behalf of IPC's Members, both as an assignee and agent, as applicable.

18.     Defendant Janet Risi ("Risi") founded IPC and was its Chief Executive Officer and President from September 1996 until December 31, 2021. She is a resident of Miami, Florida. For more than twenty years, she and her co-conspirators systematically pilfered nearly $200 million from IPC's Members, orchestrating a kickback scheme that funneled illicit payments from IPC vendors, including suppliers, distribution companies, and redistribution companies, which were then disguised as legitimate expenses to conceal the illicit activity from IPC, IPC's Board of Directors, and IPC's Members.

19.     Defendant Dennis Clabby ("Clabby") was IPC's Executive Vice President of Purchasing, overseeing Purchasing, Distribution & Logistics and Services, from September 3, 1996, through May 20, 2022. He is a resident of Parkland, Florida. Clabby became aware that vendors were paying kickbacks, and helped cover up that scheme by deliberately failing to disclose it to IPC's Board of Directors, despite numerous opportunities to do so.

20.     Defendant Jose Fernandez ("Fernandez") was IPC's Treasurer and Chief Financial Officer from January 2, 2018, through June 6, 2022. He is a resident of Miami, Florida. Fernandez became aware of the kickbacks that vendors were paying and helped cover them up deliberately failing to disclose this discovery to IPC's Board of Directors, despite numerous opportunities to do so.

21.     Defendant Diversified Restaurant Systems, Inc. ("DRS") is a company incorporated under Texas law, with its principal place of business located in Dallas, Texas. DRS purports to be a family-owned restaurant marketing and consulting company that provides, designs, and implements procurement and food marketing programs for food service and retail companies. DRS had a limited, bona fide relationship with IPC. This relationship began in 2005 when Risi verbally engaged DRS to source produce for IPC's Members. Indeed, DRS purports to have been "the produce buying arm, representing Independent Purchasing Cooperative, Inc. (IPC) for all fresh vegetables in North America, continuing this relationship for almost 25 years." This relationship was strictly limited to produce. IPC never authorized DRS to perform any services on its behalf—brokerage or otherwise—except for sourcing produce. In July 2022, IPC terminated the arrangement with DRS that authorized DRS to negotiate contracts with only produce suppliers on IPC's behalf.

22.     Defendant Daniel Spinazzola ("D. Spinazzola") is the founder and chairman of DRS. He is a resident of Rancho Santa Fe, California. D. Spinazzola founded DRS in 1986 and continues to serve as its chairman.

23.     Defendant Michael Spinazzola ("M. Spinazzola") joined DRS in 1989 and is the president and Chief Executive Officer of DRS. M. Spinazzola is a resident of Dallas, Texas.

M. Spinazzola is the son of Defendant D. Spinazzola. Where appropriate, M. Spinazzola and D. Spinazzola are referred to collectively as the "Spinazzolas."

24.     The Spinazzolas also controlled non-party Technical Food Solutions, Inc. ("TFS"), a now-inactive California company.

25.     Defendant West Liberty Foods, LLC ("WLF") is a limited liability company formed under Iowa law, with its principal place of business located in West Liberty, Iowa. WLF is a manufacturer and processor of meat and poultry products. From 2001 until March 2025, WLF was IPC's largest single supplier, responsible for providing protein products, including turkey, bacon, ham, chicken, sausage, meatballs, and roast beef. WLF supplied protein products that IPC's Members purchased through the distribution centers under the terms of WLF's contract with IPC (the "WLF Contract"), which was in place from 2001 until IPC terminated the WLF Contract in March 2025. Risi and the Spinazzolas conspired with WLF to have WLF pay kickbacks to DRS in exchange for Risi awarding WLF lucrative protein contracts with IPC. Despite WLF having nothing to do with supplying produce to IPC, between February 2005 and February 2022, WLF wired over $172 million to accounts controlled by DRS and the Spinazzolas.

26.     Defendant Lineage, Inc. ("Lineage") is a publicly traded company incorporated under Maryland law, with its principle place of business located in Novi, Michigan. Lineage is the successor-in-interest to Millard Refrigerated Services ("Millard"), which Lineage acquired in 2014. Since at least May 30, 2005, Lineage (through Millard and thereafter directly) has provided refrigerated redistribution services to IPC. Lineage stores the products and then sells them in smaller quantities to IPC's designated distributors. From at least 2005 and continuing until she left IPC on December 31, 2021, Risi conspired with Lineage to have Lineage pay kickbacks to DRS

in exchange for Risi awarding Lineage lucrative contracts with IPC. Between 2009 and September 2022, Lineage wired over $18 million to DRS-controlled accounts.

27.     Defendant Craftmark Bakery, LLC ("Craftmark") is a limited liability company formed under Texas law, with its principal place of business located in Indianapolis, Indiana. Craftmark was formed in May 2013. Craftmark makes bread, cookies, and flatbread for IPC.

28.     Defendant Camille Fournier ("Fournier") is a close personal friend of Risi and was the owner and chief executive of Southwest Re-Distribution Company, Inc. ("SWS"), a now-defunct redistribution and logistics company incorporated under Texas law, with its principal place of business located in Garland, Texas that voluntarily terminated its status as a domestic for-profit corporation on or about July 22, 2024. Non-party SWS contracted with IPC to provide redistribution services from 2011 until May 2023. Throughout this period, Fournier exercised complete control over SWS and used her position to further the kickback schemes described herein. Although SWS is now defunct, Fournier personally profited from its operations and the kickback schemes. Fournier is a resident of Dallas, Texas.

29.     Defendant Robert Cheney ("Cheney") is the former President of SWS and former owner of Southwest Sanitary Distributing Company, Inc., which he sold to Defendant Ecolab, Inc. on February 23, 2000. Cheney is the brother of Defendant Fournier. Cheney is a resident of Dallas, Texas.

30.     Defendant Georgia Pacific LLC ("GP") is a limited liability company formed under Delaware law, with its principal place of business located in Atlanta, Georgia. GP is a manufacturer of paper products, wood, and chemicals. In August 2014, GP acquired Select Product Group ("SPG"). Since 2013, GP, and its predecessor SPG, have provided IPC's Members with paper goods including paper towels, wraps, wipers, napkins, and paper bags. From GP's acquisition of

SPG in 2014 until 2023, GP paid at least $4.95 million to SWS on all of the GP products that were supplied to IPC's Members, despite the fact that 95% of the products were not redistributed through SWS.

31.     Defendant Ecolab, Inc. ("Ecolab") is a public company incorporated under Delaware law, with its principal place of business located in St. Paul, Minnesota. Ecolab is a supplier of chemical and cleaning products. In 2000, Ecolab purchased Southwest Sanitary Distributing Company, Inc., a chemical company then-owned by Defendant Cheney. Ecolab, and its predecessor Southwest Sanitary Distributing Company, Inc., have entered into agreements to supply IPC's Members with chemical and cleaning products for more than two decades. From 2004 to 2023, Ecolab paid SWS fees on the Ecolab cleaning chemical products, including hand sanitizer, that were supplied to IPC's Members, even when those products were not redistributed through SWS.

## JURISDICTION AND VENUE

32.     This action for Florida statutory and common law claims seeks damages in excess of $750,000 exclusive of costs, interest, and attorneys' fees, equitable relief as set forth herein, and attorneys' fees and costs pursuant to Section 501.2105, Florida Statutes, and is within the subject matter jurisdiction of the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade-County, Florida, Complex Business Litigation Division.

33.     Florida courts have personal jurisdiction over each of the Defendants under Florida's long-arm statute. Each of Defendants Risi, Clabby, Fernandez, DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, Craftmark, Fournier, Cheney, GP, and Ecolab committed tortious acts, or engaged in a pattern of tortious activity, which occurred in, or was directed to, the State of Florida. These tortious acts include tortious acts committed in Florida in furtherance of racketeering conspiracies and/or fraudulent schemes, such as Risi executing contracts in Florida

in exchange for illicit kickback payments and WLF, Lineage, GP, and Ecolab causing fraudulently inflated invoices to be directed to IPC's Members who are located in Florida. Similarly, this Court has personal jurisdiction over Craftmark, which also committed tortious acts in Florida, including directing fraudulent misrepresentations to IPC in Florida to induce IPC to enter into a contract with Craftmark. Further, each of Defendants Risi, Fernandez, and Clabby resides within this Circuit. Additionally, each of Defendants WLF, GP, and Ecolab operates, conducts, engages in, or carries on a business or business venture in Florida or has an office or agency in this State.

34.     Venue of this action is proper in Eleventh Judicial Circuit in and for Miami-Dade County, Florida, pursuant to Section 47.011, Florida Statutes, as to Defendants who are residents of Florida because at least one of these Defendants resides in Miami-Dade County, Florida and the causes of action accrued in Miami-Dade County. Venue of this action is proper in this Circuit as to the nonresident Defendants because this Court has personal jurisdiction over such Defendants.

## FACTUAL BACKGROUND

**A.      Risi and the Spinazzolas Funneled Kickbacks from IPC Vendors Through DRS (the "DRS Scheme")**

35.     For more than 20 years, Risi and the Spinazzolas conspired to use produce supplier DRS to solicit and receive more than $195 million in kickbacks from protein supplier WLF; redistributor Lineage; a predecessor entity of non-party bakery supplier Aryzta LLC, a Delaware limited company (the "Predecessor Nonparty"); and bakery supplier Craftmark—despite DRS not providing any legitimate services to these vendors and the vendors having nothing to do with DRS or the produce products that DRS was authorized to source for IPC—in exchange for Risi awarding those vendors lucrative IPC contracts, all at the expense of IPC's Members.

36.     Risi directed the vendors to contact DRS, who then demanded payments from the vendors in order for those vendors to receive and retain contracts from IPC. Risi and the Spinazzolas then directed the vendors to pay illegitimate "fees" to DRS and TFS.

37.     The illegitimate payments to DRS and TFS were then kicked back to Risi and the Spinazzolas in various forms, both directly and indirectly. For example, TFS paid more than $40,000 for Risi's personal housekeeper and reported at least one such payment on a 1099 as "nonemployee compensation."

38.     Once the vendors agreed to send the "pay-to-play" fees to DRS and TFS, the payments were strategically and intentionally concealed from IPC, IPC's Members, and IPC's Board of Directors. DRS funneled these illicit kickback proceeds to Defendants Risi, D. Spinazzola, and M. Spinazzola.

39.     This fraudulent kickback scheme directly harmed IPC and IPC's Members.

   **i.      Risi and D. Spinazzola Solicited Predecessor Nonparty To Participate in the DRS Scheme**

40.     In 1999, Predecessor Nonparty had the opportunity to contract with IPC to grow its brand by providing certain baked goods to IPC's Members, which would then be sold in Subway restaurants across the country. After initial negotiations with Risi, Predecessor Nonparty entered into an agreement with IPC.

41.     Shortly thereafter, Risi contacted Nick L., one of the sales executives for the Predecessor Nonparty, and instructed Nick L. to reach out to Risi's friend and confidant, D. Spinazzola, to discuss how D. Spinazzola might help Predecessor Nonparty with its new relationship with IPC.

42.     At Risi's direction, Nick L. met with D. Spinazzola, who portrayed himself as the key to an ongoing relationship with IPC because of D. Spinazzola's close relationship with Risi.

D. Spinazzola suggested that Predecessor Nonparty agree to pay DRS a fee as an "insurance policy" for the continued business relationship between IPC and Predecessor Nonparty. D. Spinazzola suggested that he would be a "silent consultant" in exchange for that fee.

43.     Predecessor Nonparty accepted D. Spinazzola's proposal and agreed to the "pay-to-play" fee in exchange for the opportunity to grow its business through IPC and the thousands of Subway restaurants operated by IPC's Members across the country.

44.     Neither DRS nor D. Spinazzola acted on behalf of Predecessor Nonparty or IPC in connection with IPC's contract with Predecessor Nonparty to provide certain baked goods to IPC's Members. Nor did DRS provide any legitimate services to Predecessor Nonparty. In fact, Predecessor Nonparty had no business relationship with DRS or D. Spinazzola other than the "fees" that it paid to DRS.

45.     From the inception of the relationship with Predecessor Nonparty and continuing until 2019, DRS was paid "fees" on certain baked goods that were sold under the IPC contract. From 2010 to 2019, DRS was paid no less than $5,697,100.28, which was in addition to amounts paid to DRS from 2000 through 2009.

46.     On information and belief, the prices of certain baked goods that the Predecessor Nonparty and its successors supplied to IPC's Members embedded the cost of the kickback scheme into the prices IPC's Members were forced to pay.

47.     On information and belief, DRS shared with Risi a portion of the illegal kickbacks DRS received from the Predecessor Nonparty and its successors.

**ii.      WLF's Participation in the DRS Scheme**

48.     WLF has been IPC's largest supplier of protein since 2001. Early in the relationship with WLF, Risi approached Ken Rutledge, WLF's then-CEO, and instructed him that WLF was required to pay kickbacks disguised as "brokerage fees" to DRS, even though there was no

12

legitimate reason for there to be a brokerage relationship between WLF and DRS in connection with IPC's business. Following Risi's instruction, WLF began paying kickbacks to DRS.

49.     WLF stood to gain at every turn. To fund its kickback payments, WLF deliberately inflated the prices it charged IPC's Members, burying the cost of WLF's payments to DRS in the top-level prices of WLF products and concealing the scheme from IPC and IPC's Members.

50.     In exchange for funneling illicit payments to DRS, Risi rewarded WLF with lucrative contracts and extensions from IPC—deals that, over more than two decades, yielded WLF billions of dollars in revenue.

51.     In 2003, Ed Garrett ("Garrett") became WLF's CEO. Upon taking the position, Garrett did not stop the illegal kickbacks that WLF was paying DRS. Instead, Garrett renegotiated the deal, and, at Risi's behest, WLF continued to pay the kickbacks to DRS.

52.     To offset the kickbacks WLF was paying to DRS, WLF artificially increased its pricing to IPC's Members by disguising the cost of the kickbacks as legitimate expenses.

53.     By 2011, WLF was paying DRS more than $10.5 million per year in connection with WLF supplying protein to IPC.

54.     Sometime prior to January 2012, M. Spinazzola called Garrett and informed him that DRS was uncomfortable receiving such a large amount of kickback payments exclusively through DRS. M. Spinazzola instructed WLF to pay a portion of the kickbacks to TFS.

55.     Thereafter, Risi confirmed M. Spinazzola's direction that WLF should make certain kickback payments to TFS. Garrett acknowledged that WLF would do so, and WLF made the first $100,000 monthly payment to TFS on or about August 2012.

56.     Neither WLF nor Garrett ever met or worked with anyone from TFS. Despite this fact, WLF wired TFS no less than $4.95 million from 2012 to 2016.

57.     TFS had no legitimate business with IPC.

58.     On August 20, 2019, as part of a larger email to the Spinazzolas, Garrett sent a file titled "DRS_IPC Presentation (1).pdf" for their review. Garrett told the Spinazzolas that he wanted to send the presentation to Risi and "[l]et [her] tell us what one to present to her team. Only option 1 in the presentation gets us competitive to the rest of the suppliers. Option 1 she would lose DRS support dollars to keep DRS close to whole. IPC's current volume can't support the dollars she's receiving from DRS/WLF. Any of the other options just make WLF that much higher than the rest of the suppliers."

59.     Later that day, D. Spinazzola responded to Garrett, stating: "I have discussed it with [Risi]. She is aware of the opportunity available to her." D. Spinazzola also told Garrett that he would "contact her tomorrow and get back with. You." D. Spinazzola then forwarded the email thread to Risi, stating: "FYI. Just in from Ed."

60.     In total, between 2004 and 2022, WLF paid DRS and TFS more than $172 million. Throughout this period, WLF artificially inflated the top-level prices it charged IPC's Members for WLF's products because of the kickback payments. Nevertheless, Risi ensured that IPC's contract remained with WLF, to the financial detriment of IPC and IPC's Members.

61.     IPC incorporates by reference the enclosed **Exhibit A**, which sets forth the payments WLF made to DRS in furtherance of the DRS Scheme, including the date and amount of each payment.

62.     DRS paid out the illicit kickbacks that DRS received from WLF to Risi, D. Spinazzola, and M. Spinazzola.

### iii. Lineage's Participation in the DRS Scheme

63.     Lineage also paid kickbacks to DRS to secure lucrative contracts with IPC.

14

64.     Beginning at least on September 30, 2009, and continuing until April 29, 2022, Lineage paid DRS a total of at least $18,399,092.85 in connection with contracts it had with IPC.

65.     IPC incorporates by reference the enclosed **Exhibit B**, which sets forth the payments Lineage made to DRS, all in furtherance to the DRS Scheme.

66.     Lineage had no legitimate relationship with DRS, D. Spinazzola, or M. Spinazzola. None of DRS, D. Spinazzola, nor M. Spinazzola acted on behalf of Lineage or IPC in connection with Lineage's contracts to provide services to IPC or IPC's Members. DRS did not provide any legitimate services to Lineage.

67.     Lineage artificially inflated the prices it charged to IPC's Members for Lineage's services by $0.005/lb. to cover the cost of these kickbacks and concealed these illicit payments in Lineage's top-level prices.

68.     On information and belief, DRS shared with Risi a portion of the illicit kickbacks that DRS received from Lineage.

**B.     Craftmark Also Made Illegitimate Payments to DRS**

69.     In 2013, several bakery companies approached IPC to bid on providing IPC's Members with bakery products, such as bread, flatbread, and cookies.

70.     Despite the interest by other suppliers, in July 2013, IPC entered into a long-term contract with Craftmark (the "Craftmark Contract"), pursuant to which Craftmark constructed new production lines to supply IPC's Members with bakery products.

71.     While Craftmark represented to IPC in July 2013 that the cost of equipment for the new production lines would be $58 million, the final cost purportedly was approximately $74 million.

72.     The Craftmark Contract, including the amendments thereto, were executed by Risi and Ahmad Hamade, Craftmark's then-CEO.

73.     Before becoming Craftmark's CEO, Hamade served as CFO of Predecessor Nonparty at the time that Predecessor Nonparty started making kickback payments to DRS.

74.     Craftmark represented to IPC that Craftmark would not make any payments to any undisclosed persons or entities in connection with the sales of Craftmark products to IPC.

75.     The Craftmark Contract includes volume commitments and corresponding penalties, which Craftmark represented were intended to compensate Craftmark for unrecovered overhead costs should IPC's Members fail to order a minimum annual volume of any product.

76.     Unbeknownst to IPC and IPC's Members, however, despite not being a produce supplier, Craftmark intended to, and did, make payments to DRS in connection with Craftmark supplying bakery products to IPC's Members.

77.     Craftmark concealed and recouped the kickback payments it made to DRS in both overhead expenses (including under the guise of sales and management fees Craftmark charged IPC) as well as within Craftmark's overall pricing structure (including the volume-based penalties Craftmark charged IPC).

78.     Given that IPC had entered into a long-term contract with Craftmark, which included minimum volume requirements, and that Craftmark was not a produce supplier, there was no legitimate basis for Craftmark to make any payments to DRS, nor could DRS have been providing any legitimate services to Craftmark in connection with the Craftmark Contract.

**C.      Risi, Fournier, and Cheney Funneled Kickbacks from IPC Vendors Through SWS**

79.     Risi also worked with Fournier and Cheney to use SWS to solicit kickbacks from GP, Ecolab, and their predecessors SPG and Southwest Sanitary Distributing Company, Inc.—both of which had ties to Cheney—in exchange for Risi awarding contracts to those vendors.

80.     As with the DRS Scheme, there was no legitimate business reason for GP and Ecolab to pay any money to SWS.

81.     In August 2011, Risi awarded SWS a lucrative redistribution contract with IPC, despite the availability of lower cost alternatives.

82.     GP paid SWS "fees" for the wipers, towels, and tissues sold to IPC's Members regardless of whether it used SWS's redistribution centers or services. From 2014 (when GP acquired SPG) through 2023 (when IPC discovered the scheme and stopped doing business with SWS), GP paid SWS no less than $4.95 million in "fees." On information and belief, Defendants Cheney and Fournier each facilitated these payments through SWS for their own separate and personal financial benefit.

83.     Similarly, Ecolab paid "fees" to SWS in connection with cleaning chemical products, including hand sanitizer, that Ecolab sold to IPC, notwithstanding that SWS provided no redistribution services or other legitimate business functions with respect to those products. On information and belief, Defendants Cheney and Fournier each facilitated these payments through SWS for their own separate and personal financial benefit.

84.     On information and belief, like the vendors involved in the DRS Scheme, GP and Ecolab made those illegitimate payments to SWS to secure Risi's continued award of IPC contracts in their favor. And, on information and belief, like the vendors involved in the DRS Scheme, to both recoup the cost of these illicit payments and to conceal the payments within their overall pricing structures, GP and Ecolab inflated the prices charged to IPC's Members for their respective products.

85.     On information and belief, SWS paid Defendants Risi, Fournier, and Cheney from the "fees" SWS received from GP.

86.     On information and belief, SWS paid Defendants Risi, Fournier, and Cheney from the "fees" SWS received from Ecolab.

87.     In November 2021, shortly before her departure from IPC, and without authorization or regard for IPC's interests, Risi rewarded SWS for its role in the kickback scheme with a lucrative contract extension.

**D.      Clabby and Fernandez Concealed Risi's Schemes from IPC**

88.     Initially, no one at IPC, other than Risi, was aware of the fraudulent kickback schemes described in paragraphs 35–87. Indeed, given her trusted role as IPC's founder, CEO, and President, and her sophisticated utilization of third-party entities through which to solicit and funnel illicit kickback payments made by certain vendors, Risi was able to operate her elaborate multi-million dollar schemes undetected. Through such actions, Risi intentionally concealed the kickback schemes she orchestrated from IPC, IPC's Board of Directors, and IPC's Members.

89.     In 2019, however, Garrett forwarded an email to which he attached an IPC/DRS/WLF Business Update presentation (the "WLF/DRS/IPC Presentation") to Clabby. The WLF/DRS/IPC Presentation showed that, from 2011 through 2018, WLF paid DRS anywhere from $10.4 million to more than $12.7 million each year in "commissions"—payments that WLF acknowledged had rendered its prices significantly higher than those of competing suppliers.

90.      Upon receipt of the IPC/DRS/WLF Presentation, Clabby became aware that WLF was paying at least $10 million a year in fake "commissions" to DRS, resulting in WLF pricing to IPC's Members being significantly inflated.

91.     In his role as EVP of Purchasing, Clabby knew that DRS was not authorized to act on behalf of IPC with respect to any products other than produce. He also knew that DRS was not legitimately engaged to represent WLF in any capacity.

92.     After receiving the presentation from WLF, Clabby telephoned Garrett, who informed Clabby that, several years earlier, Risi had confronted both Garrett and WLF's then-CEO, Ken Rutledge, and directed them to make kickbacks payments to DRS.

93.     After this conversation with Garrett, Clabby grew suspicious that the successor to Predecessor Nonparty likewise was paying "fees" to DRS. Clabby's suspicion was confirmed when he called the successor to Predecessor Nonparty in 2019 and the CEO of the successor to Predecessor Nonparty disclosed to Clabby that the successor to Predecessor Nonparty was making payments to DRS.

94.     Shortly after these discussions, Clabby called his contact at Lineage, suspecting that, based on Risi's close relationship with Lineage, Lineage also was paying kickbacks to DRS. Clabby asked his contact if Lineage was paying kickbacks to DRS, but the contact refused to answer. Clabby then said he would assume that Lineage was paying kickbacks to DRS if the contact did not respond; the contact's silence was telling.

95.     At or around this same time, Clabby confronted Risi and asked if Craftmark also was making payments to DRS. Risi confirmed that Craftmark was including payments to DRS in the price of Craftmark's bakery products.

96.     Clabby was suspicious that DRS was splitting the kickbacks with Risi. Clabby did not, however, reveal to or discuss with anyone at IPC (other than Risi) his conversations with his contact at Lineage, WLF's CEO, or the CEO of the successor to Predecessor Nonparty. Indeed, despite attending several board meetings between learning this information in 2019 and his departure from the company in 2022, Clabby never disclosed his full knowledge of the DRS Scheme to IPC's Board of Directors or anyone else at IPC.

97.     Further, in the fall of 2021, during the negotiations of amendments to the Craftmark Contract, an IPC employee who worked on strategically sourcing bakery products began pressing Craftmark for more detailed information regarding certain overhead expenses that Craftmark was including in its pricing. Clabby instructed that employee to stop asking questions and subsequently

cut that employee out of the negotiation process. Clabby and Risi then finalized the negotiations with Craftmark on their own.

98.     Clabby financially benefitted from his concealment of Risi's kickback scheme.

99.     For example, between 2019 and 2021, Clabby's compensation at IPC almost tripled. This included a $300,000 bonus payment Clabby received in 2019, and a $500,000 bonus payment Clabby received in 2021.

100.     At some point, Fernandez, who was IPC's Treasurer and Chief Financial Officer, as well as a close confidant of Risi, became aware of Risi's kickback schemes.

101.     For example, on July 3, 2019, in response to questions from IPC's external auditor, BDO, Fernandez obtained a letter from WLF stating that WLF was making payments to IPC in the amount of $40,000 per month "for IPC programs and initiatives to be used at IPC's discretion for events and programs."

102.     Fernandez was also privy to information regarding IPC's contracts with the vendors involved in the DRS Scheme and was aware of DRS consulting invoices that were being paid by vendors.

103.     Fernandez financially benefitted from his concealment of Risi's kickback scheme.

104.     For example, from 2018 to 2021, Fernandez's compensation at IPC more than doubled. This included a $150,000 bonus payment Fernandez received in 2019 and a $370,000 bonus payment Fernandez received in 2021.

105.     In May 2021, Fernandez corresponded with Risi concerning the WLF Contract, and in doing so, attached the 2019 letter agreement executed by Risi that extended the WLF Contract, which still had two years remaining, by an additional seven years.

106.    That same month, Fernandez outsourced IPC's human resources function by signing a three-year agreement (the "LSG Agreement") with LS Global Group LLC ("LSG"), a company operated by a close friend of Risi's son. Fernandez did not competitively bid this work, and LSG lacked experience providing human resources services to an organization of IPC's size and scope.

107.    Then, on October 20, 2021, Fernandez signed an amendment to the LSG Agreement. Despite being only five months into the original three-year term, the amendment that Fernandez executed extended the LSG Agreement for an additional three years. The amendment also included an annual "administration fee" of $120,000 and a multi-million dollar buyout clause if IPC terminated the contract early.

108.    On information and belief, Fernandez received financial benefit from the LSG Agreement.

109.    Fernandez never revealed or otherwise discussed with anyone at IPC (other than Risi) the existence of the DRS Scheme, and, despite attending several board meetings from the time he joined IPC in 2018 until he left the company in 2022, he never disclosed the kickback scheme to IPC's Board of Directors or anyone else at IPC.

110.    By concealing Risi's kickback scheme from everyone at IPC (other than Risi) while personally benefiting from a scheme that harmed IPC and IPC's Members, Clabby and Fernandez abandoned and acted entirely adverse to IPC's and IPC's Members' interests, ensuring that Risi could continue to defraud IPC and IPC's Members undetected.

**E.    Risi's Departure from IPC**

111.    In August 2021, Risi and IPC announced that Risi would be leaving IPC.

112.    On August 24, 2021, Risi and IPC entered into a separation agreement (the "Risi Separation Agreement"), which terminated Risi's employment agreement without cause, effective December 31, 2021.

113.    At no time prior to entering into the Risi Separation Agreement did Risi disclose the fraudulent kickback schemes involving DRS or SWS to IPC's Board of Directors. Indeed, Risi has never disclosed the fraudulent kickback schemes to anyone at IPC or the IPC Board of Directors, other than to her fellow co-conspirators at IPC—Clabby and Fernandez. Rather, in addition to deliberately failing to disclose the schemes, Risi took affirmative actions to conceal the schemes from IPC and IPC's Board of Directors, including by utilizing third-party transactions to disguise the kickbacks as legitimate expenses.

114.    On October 8, 2021, after executing the Risi Separation Agreement, Risi executed amendments to the Craftmark Contract in which Risi agreed to minimum volume requirements with Craftmark that greatly exceeded the demand necessary to supply the bakery product requirements of IPC's Members. These new minimum volume requirements resulted in IPC paying larger penalties to Craftmark.

115.    On December 31, 2021, Risi left her role as IPC's CEO.

## F.    IPC's Discovery of the Kickback Schemes

116.    On January 31, 2022, Kirsten Michulka ("Michulka") replaced Risi as IPC's CEO and President.

117.    Shortly after becoming IPC's CEO and President, Michulka began asking Clabby questions about certain vendor agreements and transactions.

118.    In an attempt at self-preservation, Clabby partially disclosed the existence of the DRS Scheme to Michulka. Clabby failed to fully disclose or account for his own culpability in the DRS Scheme.

119.   Clabby contacted WLF's CEO, Garrett, and told Garrett to stop paying all fees to DRS.

120.   Garrett subsequently informed M. Spinazzola that, if DRS wanted to continue collecting the fraudulent "commissions," DRS was going to have to sue WLF for breach of contract.

121.   Once WLF stopped paying kickbacks to DRS, WLF reduced the prices it charged to IPC's Members by approximately $9 million a year.

122.   Similarly, once Lineage stopped paying kickbacks to DRS, Lineage reduced the prices it charged to IPC's Members by $0.0045/lb., which equated to about $1 million per year less that Lineage charged IPC's Members for Lineage's redistribution services.

123.   Following its discovery of the existence of payments WLF was making to DRS, IPC required its vendors to disclose any payments the vendors were making to third parties in connection with the vendors' provision of goods or services for IPC's Members under the vendors' contracts with IPC.

124.   When required to disclose these third-party payments, WLF provided a table that showed, among other things, it had paid DRS and TFS more than $172 million from 2005 through 2022.

125.   GP disclosed that it was paying "fees" to SWS for the wipers, towels, and tissues that it sold to IPC's Members, regardless of whether such products were going through SWS's redistribution centers.

126.   Ecolab initially refused to make any disclosures to IPC but subsequently confirmed that it too was paying "fees" to SWS for certain cleaning chemical products it sold, such as hand sanitizer.

127.     On May 20, 2022, Clabby left IPC.

128.     On June 27, 2022, Fernandez executed a severance agreement with IPC (the "Fernandez Severance Agreement"), in which IPC terminated Fernandez's employment agreement. In the Fernandez Severance Agreement, Fernandez affirmatively represented to IPC that he had "no knowledge of any violation of the law or any of IPC's policies or standards of conduct by [Fernandez] or any of IPC's other employees or contractors during the course of [his] employment with IPC or otherwise."

## COUNT I
### Florida Civil Remedies for Criminal Practices Act and Florida Racketeer Influenced and Corrupt Organization Act (Fla. Stat. §§772.103(3) and 895.03) (Against the Defendants Risi, Clabby, Fernandez, DRS, Daniel Spinazzola, Michael Spinazzola, WLF, and Lineage)

129.     Plaintiff re-alleges the allegations set forth in paragraphs 1–26, 32–68, and 88–124 of this complaint as if fully set forth herein.

130.     This count is against Defendants Risi, Clabby, Fernandez, DRS, D. Spinazzola, M. Spinazzola, WLF, and Lineage (the "DRS Enterprise Defendants" or "DRS Enterprise").

131.     This Count alleges claims against the DRS Enterprise Defendants under the Florida Civil Remedies for Criminal Practices Act, Chapter 772, Florida Statutes, and the Florida Racketeer Influenced and Corrupt Organization ("RICO") Act, Chapter 895, Florida Statutes, asserting a statutory right of action against the DRS Enterprise Defendants for their conduct of, or participation in, an enterprise through a pattern of criminal racketeering activity in violation of Fla. Stat. §§ 772.103 and 895.03.

132.     The DRS Enterprise Defendants are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in this Complaint; namely, through a multi-faceted campaign of lies, bribery, kickbacks, and fraud, which cost IPC and IPC's Members millions of dollars. The DRS Enterprise Defendants have organized

24

their operation with each defendant playing a specific role and with Risi directing the various

co-conspirators.

a)   Defendant Risi was responsible for the oversight of the scheme to defraud IPC's Members and solicited kickbacks from vendors, including Defendants WLF and Lineage. Risi directed other co-conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise.

b)   Defendant Clabby knew about the DRS Scheme but until 2022, concealed it from IPC, IPC's Board of Directors, and IPC's Members for his own financial benefit and adversely to the interests of IPC and IPC's Members. Even then, Clabby failed to disclose his full knowledge of the DRS Scheme.

c)   Defendant Fernandez also knew of the DRS Scheme but concealed it from IPC, IPC's Board of Directors, and IPC's Members for his own financial benefit and adversely to the interests of IPC and IPC's Members.

d)   Defendant DRS funneled kickback payments from WLF, Predecessor Nonparty and its successors, and Lineage to Risi under the guise of acting as a "silent consultant." Defendant DRS submitted fraudulent invoices for its purported consultant services to WLF, Predecessor Nonparty and its successors, and Lineage, directing those vendors to pay the kickbacks in exchange for those vendors maintaining their lucrative contracts with IPC so that DRS could funnel the kickbacks to Risi, D. Spinazzola, and M. Spinazzola.

e)   Defendant D. Spinazzola conspired with Risi to concoct the scheme. Together with his son, M. Spinazzola, D. Spinazzola controlled and directed DRS in the submission of the fraudulent invoices to WLF, Predecessor Nonparty and its successors, and Lineage under the guise of acting as those vendors' silent consultant and, on information and belief, directed DRS to pay the kickbacks to Risi, himself, and M. Spinazzola for their own personal financial benefit.

f)   Defendant M. Spinazzola, together with his father D. Spinazzola, controlled and directed DRS in the submission of the fraudulent invoices to WLF, Predecessor Nonparty and its successors, and Lineage under the guise of acting as those vendors' silent consultant and, on information and belief, directed DRS to pay the kickbacks to Risi, himself, and D. Spinazzola for their own personal financial benefit.

g)   Defendant WLF made at least $172 million dollars in kickback payments to DRS and TFS knowing that, in turn, DRS and TFS would funnel those kickback payments to Risi. In exchange, and based upon Risi's assurances, WLF expected to retain its lucrative contract with IPC. WLF caused fraudulently inflated prices for its products to be charged in invoices directed to IPC's Members. WLF inflated the prices of its products to account for and conceal more than $172 million in kickback payments that it made to DRS and TFS.

h)    Defendant Lineage made at least $18,399,092.85 in kickback payments to DRS beginning at least on September 30, 2009, and continuing until April 29, 2022, with the understanding that, in turn, DRS would funnel the kickback payments to Risi. In exchange, and based on Risi's assurances, Lineage expected to retain its lucrative contract with IPC. Lineage caused fraudulently inflated prices for its services to be charged in invoices directed to IPC's Members. Lineage inflated the prices of its services to account for and conceal more than $18 million in kickback payments that it made to DRS.

133.    The purpose of the DRS Enterprise was to generate as much profit as possible from their fraudulent scheme by securing lucrative contracts from IPC for certain vendors, including Defendants WLF and Lineage, and maximizing the kickbacks paid to Defendants Risi, DRS, M. Spinazzola, and D. Spinazzola while intentionally concealing the DRS Scheme from IPC and IPC's Members for the DRS Enterprise Defendants' own personal financial benefit.

134.    The DRS Scheme constitutes an association-in-fact enterprise within the meaning of Fla. Stat. §§ 772.102(3), 772.103(3), 895.02(5), and 895.03(3).

135.    The DRS Enterprise Defendants each participated, directly and indirectly, in the DRS Enterprise, including through the conduct, management, or operation of the DRS Enterprise's affairs through a "pattern of criminal activity" within the meaning of Fla. Stat. § 772.102(4) and in violation of Fla. Stat. §§ 772.103(3) and a pattern of racketeering activity within the meaning of Fla. Stat. §§ 895.02(7) and 895.02(8)(a), including through the violations of the Florida Communications Fraud Act, pursuant to § 817.034, and the Florida Money Laundering Act, pursuant to § 896.101, set forth in paragraphs 35–68 and 88–124. These incidents of criminal and racketeering activity had the same or similar intents, results, accomplices, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics and are not isolated incidents.

136.    As set forth in paragraph 32, Defendants Risi, D. Spinazzola, and M. Spinazzola each directed and controlled the DRS Enterprise by, among other things, developing personal

relationships with these vendors, including Defendants WLF and Lineage, ensuring that these vendors retained contracts with IPC, soliciting these vendors to engage with DRS and pay kickbacks to DRS disguised as "brokerage fees" or "commissions," and directing DRS to distribute the kickbacks to Defendants Risi, D. Spinazzola, and M. Spinazzola.

137.    As set forth in paragraph 32, Defendants D. Spinazzola, M. Spinazzola, DRS, WLF, and Lineage each directed and controlled the DRS Enterprise by, among other things, intentionally concealing the kickbacks from IPC and IPC's Members by entering into sham agreements between DRS and the vendors.

138.    As set forth in paragraph 32, Defendants WLF and Lineage each directed and controlled the DRS Enterprise by, among other things, intentionally concealing the kickbacks from IPC and IPC's Members by burying the costs of these kickbacks in the top-level prices WLF and Lineage charged IPC's Members for good and services, and causing invoices containing these fraudulently inflated prices to be directed to IPC's Members.

139.    As set forth in paragraph 32, Defendants Risi, Clabby, and Fernandez each directed and controlled the DRS Enterprise by, among other things, using their positions within IPC to conceal the DRS Scheme from IPC, IPC's Board of Directors, and IPC's Members, for their own personal financial benefit and entirely adverse to the interests of IPC and IPC's Members.

140.    The DRS Enterprise Defendants committed a substantial number of related incidents of criminal activity and racketeering conduct over an extended period of time, including the predicate acts enumerated in paragraphs 141–143, 35–68 and 88–124. Each predicate act constitutes "criminal activity" within the meaning of Fla. Stat. § 772.102(1) and "racketeering activity" within the meaning of Fla. Stat. § 895.02(8).

141.    As set forth in paragraphs 48–62, from at least 2004 through January 2022, WLF paid a total of no less than $172 million in kickbacks to DRS and TFS over a series of transactions. The costs of WLF's kickback payments were then passed on to IPC's Members through fraudulent invoices containing artificially inflated prices for WLF's products. IPC incorporates by reference the attached **Exhibit A**, which sets forth the payments WLF made to DRS in furtherance of the DRS Scheme, including the payment date and amount paid. WLF knowingly included the full cost of each of these payments in the fraudulent invoices it caused to be sent to IPC's Members without disclosing them, thereby defrauding IPC's Members.

142.    As set forth in paragraphs 63–68, from at least 2004 through January 2022, Lineage paid at least $18 million in kickbacks to DRS over a series of at least hundreds of transactions. IPC incorporates by reference the attached **Exhibit B**, which sets forth certain payments Lineage made to DRS in furtherance of the DRS Scheme. All of these payments were billed to IPC's Members via fraudulent invoices. The kickback payments were concealed in the top-line price of the services that Lineage provided.

143.    As set forth in paragraphs 35–78, DRS, D. Spinazzola, M. Spinazzola, and Risi each committed numerous acts of racketeering activity in furtherance to the DRS Scheme by soliciting and receiving through wires or other means at least $195 million in kickbacks disguised as "brokerage fees" or "commissions" from vendors involved in the DRS Scheme to be paid to DRS or TFS, including Defendants WLF and Lineage as described in paragraphs 35–68 above.

144.    Each of the DRS Enterprise Defendants' payments or transfers to DRS and TFS constitutes a violation of the Florida Communications Fraud Act.

145.    As described in paragraphs 132–144 above, each of the DRS Enterprise Defendants engaged in a scheme to defraud IPC and IPC's Members by engaging in a systematic, ongoing

course of conduct over the course of almost twenty years with the intent to defraud IPC and IPC's Members, or with intent to obtain property from IPC and IPC's Members by false or fraudulent pretenses, or representations through the fraudulent invoices sent to and paid by IPC's Members.

146.    IPC and IPC's Members reasonably relied on the invoiced prices and reasonably believed that the prices reflected in those invoices were accurate and did not include any improper kickbacks or artificial costs. As such, IPC's Members paid the invoiced prices in full, including unknowingly paying for the illegitimate kickbacks built into the prices. Each of the DRS Enterprise Defendants therefore obtained property from IPC's Members well in excess of $50,000.

147.    Each of the DRS Enterprise Defendants' payments or transfers to DRS and TFS also constitutes a violation of Florida Money Laundering Act.

148.    As described herein, each of the DRS Enterprise Defendants knew that the property involved in each of the illicit financial transactions, which affected commerce or involving the use of a financial institution, represented the proceeds of the fraudulent kickback schemes.

149.    Each of the DRS Enterprise Defendants conducted or attempted to conduct each of these financial transactions involving the proceeds of the kickback scheme, which involved the movement of funds by wire or other means for transactions in excess of $10,000, with the intent to promote the carrying on of the unlawful DRS Scheme. The DRS Enterprise Defendants each transferred large sums of money among themselves using wire transfers or other means, including, on information and belief, transferring monies to Risi from the kickback payments received by DRS, in furtherance of the DRS Enterprise Defendants' complex scheme to defraud IPC's Members.

150.    As described herein, each of the DRS Enterprise Defendants knew that each of the transactions was designed in whole or in part to conceal or disguise the nature, the location, the

source, the ownership, or the control of the proceeds of the fraudulent scheme from IPC and IPC's Members. Each of the DRS Enterprise Defendants submitted, or caused to be submitted, hundreds of fraudulent invoices, intentionally concealing the kickback payments to DRS underlying the artificially inflated prices that IPC's Members were being charged for products. Each illegitimate kickback payment was disguised as a "commission" or "brokerage fee" to DRS despite DRS not providing any legitimate services, and was in fact an intentional payment in furtherance of the DRS Scheme and in accordance with Risi's directives.

151.     As described in paragraphs 7, 18–20, 38, 48–49, 52, 60, 67, 88–97, 100–102, 109–110, and 113, each of the DRS Enterprise Defendants fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of the DRS Enterprise Defendants' concealment, IPC did not discover the conduct alleged herein until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

152.     IPC and IPC's Members were injured by reason of the DRS Enterprise Defendants' violations of Fla. Stat. §§ 772.103(3) and 895.03(3) and the predicate acts.

153.     By reason and as a result of DRS Enterprise Defendants' conduct and participation in the racketeering activity alleged herein, the DRS Enterprise Defendants have caused damages to IPC's Members in the form of unreasonably inflated charges for goods and services and to IPC in the form of compensation IPC paid to Defendants Risi, Clabby, and Fernandez while they were acting for their own personal financial benefit and for the benefit of the DRS Enterprise, and entirely adverse to IPC's and IPC's Member's interests.

## COUNT II
### Conspiracy to Violate Florida Civil Remedies for
### Criminal Practices Act (Fla. Stat. §772.103(4))
### (Against the DRS Enterprise Defendants)

154.     Plaintiff re-alleges the allegations set forth in paragraphs 1–26, 32–68, and 88–124 of this complaint as if fully set forth herein.

155.     Further, because this Count II is for the conspiracy based on the same facts and circumstances as the violations of the Florida Civil Remedies for Criminal Practices Act alleged in Counts I, the allegations of paragraphs 130–153 are re-alleged and incorporated as if fully set forth herein.

156.     Defendants violated Fla. Stat. §§ 772.103(4) and 895.03(4) by conspiring to violate Fla. Stat. §§ 772.103(3) and 895.03(3), respectively.

157.     In furtherance to the DRS Scheme, the DRS Enterprise Defendants each agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity, including through the violations of the Florida Communications Fraud Act, pursuant to § 817.034, and the Florida Money Laundering Act, pursuant to § 896.101, set forth in paragraphs 135 and 140–150 above.

158.     The DRS Enterprise Defendants agreed to the overall objective of the conspiracy: to generate as much profit as possible from their fraudulent scheme by securing lucrative contracts from IPC for certain vendors, including Defendants WLF and Lineage, and maximizing the kickbacks paid to Defendants Risi, DRS, M. Spinazzola, and D. Spinazzola.

159.     In furtherance of the enterprise, the DRS Enterprise Defendants committed the numerous predicate acts of criminal and racketeering activity described above in paragraphs 135, and 140–150.

160.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, IPC's Members were injured in their business or property.

161.     As described in paragraphs 7, 18–20, 38, 48–49, 52, 60, 67, 88–97, 100–102, 109–110, and 113, each of the DRS Enterprise Defendants fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of the DRS Enterprise Defendants' concealment, IPC did not discover the existence of the DRS Scheme until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

<u>**COUNT III**</u>
**Fraud**
**(Against Defendants Janet Risi, DRS, Daniel Spinazzola, Michael Spinazzola,**
**West Liberty Foods, Lineage)**

162.     Plaintiff re-alleges the allegations set forth in paragraphs 1–27, 32–78, and 111–124 of this complaint as if fully set forth herein.

163.     As described in paragraphs 1–27, 32–78, 111–124 and 132–144 above, for more than 20 years, Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, WLF, and Lineage operated the DRS Scheme, whereby Risi, D. Spinazzola, and M. Spinazzola worked in concert to solicit the payment of kickbacks to DRS from various vendors, including WLF and Lineage, in exchange for Risi awarding, and continue to award, lucrative supply contracts from IPC to those vendors.

164.     Despite having no legitimate business relationship with DRS, WLF and Lineage each paid DRS "brokerage fees" and "commissions" associated with the products and services that WLF and Lineage sold to IPC's members.

165.     WLF and Lineage each artificially inflated the contract prices for their goods and services in the invoices for the products they sold to IPC's Members so that the costs of these "brokerage fees" and "commissions" were concealed in the top-line price of those goods and services.

166.     Between 2004 and 2022, WLF submitted numerous invoices, hiding within the price of its goods a total of no less than $172 million in kickbacks paid by WLF.

167.     From 2009 to 2022, Lineage submitted numerous invoices, hiding within the price of its services a total of at least $18.4 million in kickbacks paid by Lineage.

168.     Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, WLF, and Lineage each knew that, by concealing the cost of the kickbacks in the prices WLF and Lineage charged for their goods and services, IPC's Members would be deceived into paying for the kickbacks that flowed through the DRS Scheme.

169.     Relying on the belief that Risi was approving contracts that were being negotiated in good-faith and at arms-length on behalf of IPC's Members, and that the contract prices being charged by WLF and Lineage accurately reflected the value of the goods and services IPC's Members were receiving, IPC's Members paid the prices included in the Lineage invoices and the WLF prices passed through WLF's distributors' invoices.

170.     By unknowingly paying the costs of the illicit kickbacks buried in the top-level prices that WLF and Lineage charged for their goods and services, IPC's Members suffered damages.

171.     As described in paragraphs 7, 18–20, 38, 48–49, 52, 60, 67, and 113, each of Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, WLF, and Lineage fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and

intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of their concealment, IPC did not discover the conduct alleged herein until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

<u>**COUNT IV**</u>
**Fraud**
**(Against Defendants Janet Risi, Robert Cheney, Camille Fournier, Georgia Pacific, and Ecolab)**

172.    Plaintiff re-alleges the allegations set forth in paragraphs 1–18, 28–34, 79–87, 111–114, and 125–126 of this complaint as if fully set forth herein.

173.    As described herein, for more than 20 years, Defendants Risi, Cheney, Fournier, GP, and Ecolab operated a fraudulent scheme whereby Risi, Cheney, and Fournier worked in concert to solicit the payment of kickbacks to SWS from various vendors, including GP and Ecolab, in exchange for Risi awarding, and continue to award, lucrative supply contracts from IPC to those vendors, including by (a) Risi soliciting the kickbacks from vendors, including GP and Ecolab, in exchange for Risi awarding those vendors with lucrative IPC contracts; (b) Cheney operating and/or controlling SWS and using his position to further the kickback scheme by funneling the illicit payments from vendors, including GP and Ecolab, through SWS; and (3) Fournier operating and/or controlling SWS and using her position to further the kickback scheme by funneling the illicit payments from vendors, including GP and Ecolab, through SWS.

174.    Indeed, as described in paragraphs 79–87, GP and Ecolab each paid "fees" to SWS on various products, including GP's wipers, towels, and tissues and Ecolab's cleaning chemical products, such as hand sanitizer, regardless of whether SWS was involved in supplying those products to IPC's Members through SWS's redistribution centers.

175.    GP and Ecolab then inflated the contract prices for those products in its invoices so that the costs of these "fees" were concealed in the top-line price of those products.

176.    From 2014 to 2023, GP submitted, or caused to be submitted, to IPC's Members numerous invoices, hiding within the price of its wipers, towels, and tissues a total of no less than approximately $4.95 million in "fees" paid to SWS by GP.

177.    From 2004 to 2023, Ecolab submitted, or caused to be submitted, to IPC's Members numerous invoices, hiding within the price of its cleaning chemical products, such as hand sanitizer, the "fees" paid to SWS by Ecolab.

178.    Defendants Risi, Cheney, Fournier, GP, and Ecolab each knew that, by concealing the cost of the kickbacks in the prices that GP and Ecolab charged for their goods and services, they would deceive IPC's Members into funding the illicit kickback scheme.

179.    Relying on the belief that Risi was approving contracts that were being negotiated in good-faith and at arms-length on behalf of IPC's Members, and that the contract prices being charged by GP and Ecolab accurately reflected the value of the goods and services IPC's Members were receiving, IPC's Members paid the prices included in the invoices for GP and Ecolab products.

180.    By unknowingly paying the costs of the illicit kickbacks buried in the top-level prices that GP and Ecolab charged for their goods and services, IPC's Members suffered damages.

181.    As described in paragraphs 7, 18, 82–87, 111–113, and 125–126, each of Defendants Risi, Cheney, Fournier, GP, and Ecolab fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of their concealment, IPC did not discover the conduct alleged herein until after

Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

<u>COUNT V</u>
**Fraudulent Inducement and Rescission of Risi Separation Agreement**
**(Against Defendant Janet Risi)**

182.    Plaintiff re-alleges the allegations set forth in paragraphs 1–115 of this complaint as if fully set forth herein.

183.    As IPC's CEO from 1996 through December 31, 2021, Risi owed fiduciary duties to IPC, including the duties of good faith, care, and loyalty.

184.    As the person responsible for approving master contracts that dictated the prices, terms, and conditions under which IPC's Members would pay for goods and services, Risi also owed fiduciary duties to IPC's Members to act in their best interests.

185.    As described in paragraphs 1–8, 18–31, and 35–115, for over 20 years, Risi orchestrated sophisticated fraudulent kickback schemes, using DRS and SWS to solicit and receive kickbacks from the Vendor Defendants. DRS shared those ill-gotten gains with Risi, and, on information and belief, SWS also shared the ill-gotten gains with Risi.

186.    On August 24, 2021, Risi and IPC entered into the Risi Separation Agreement, which terminated Risi's employment agreement without cause, effective December 31, 2021. A true and correct copy of the Risi Separation Agreement is attached as **Exhibit C**.

187.    Given the fiduciary duties that Risi owed to IPC and IPC's Members as IPC's CEO and President, it is axiomatic that Risi was prohibited from orchestrating and profiting from the fraudulent kickback schemes described herein. Yet having chosen to operate these kickback schemes, Risi also was obligated by the fiduciary duties that she owed to IPC and IPC's Members as IPC's CEO to disclose the fraudulent kickback schemes to IPC, IPC's Board of Directors, and IPC's Members, particularly in connection with entering into the Risi Separation Agreement.

36

188.    Instead of disclosing the fraudulent kickback schemes consistent with her fiduciary obligations, Risi deliberately withheld and concealed that information from IPC when entering into the Risi Separation Agreement in order to fraudulently induce IPC to agree to the terms and conditions in the Risi Separation Agreement. As a result of Risi's concealment, IPC could not and did not discover the conduct alleged herein until after Risi departed from IPC.

189.    At the time IPC entered into the Risi Separation Agreement, IPC's Board of Directors was unaware of Risi's fraudulent kickback schemes, nor could IPC, IPC's Board of Directors, or IPC's Members have discovered Risi's fraudulent kickback scheme, given Risi's position as CEO and associated ability to conceal her fraudulent conduct, which she abused to conceal the schemes and her conduct. Indeed, had IPC's Board of Directors known of Risi's conduct, IPC would have terminated Risi's employment agreement for cause, as warranted by Risi's decades of deception.

190.    IPC has rescinded the Risi Separation Agreement and has notified Risi of its rescission of the Risi Separation Agreement.

191.    IPC has not retained any benefits from the Risi Separation Agreement.

192.    To the extent IPC received any benefits from the Risi Separation Agreement, such benefits have been restored to Risi through the rescission of the Risi Separation Agreement.

193.    Given the nature of the Risi Separation Agreement and the provisions contained therein. IPC has no adequate remedy at law, as any monetary damages arising from the Risi Separation Agreement are insufficient to fully compensate IPC for Risi's role in, and fraudulent concealment of, the fraudulent kickback schemes when IPC and Risi entered into the terms of the Risi Separation Agreement.

194.   It would be inequitable for Risi to retain the benefits of the Risi Separation Agreement given her role in the fraudulent kickback schemes involving DRS and SWS and her deliberate and fraudulent concealment of those schemes from IPC, IPC's Board or Directors, and IPC's Members, through which fraudulent concealment Risi intended to induce IPC to enter into the Risi Separation Agreement and confer on Risi the benefits contained therein and provided thereby.

## COUNT VI
### Fraudulent Inducement
### (Against Defendant Craftmark Bakery, LLC)

195.   Plaintiff re-alleges the allegations set forth in paragraphs 1–27, 32–47, and 69–78 of this complaint as if fully set forth herein.

196.   IPC and Craftmark entered into the Craftmark Contract. The Craftmark Contract was signed by Risi, on the one hand, and by Hamade, on the other. Hamade, who was the CEO of Craftmark, previously served as CFO of Predecessor Nonparty at the time Predecessor Nonparty made kickback payments to DRS as part of Risi's scheme.

197.   To induce IPC to enter into the Craftmark Contract on behalf of IPC's Members, as well as the subsequent amendments thereto, Craftmark falsely represented that it would not make any payment to any person or entity in connection with any sales of its products other than those payments that were expressly disclosed to IPC.

198.   Contrary to this representation, Craftmark knew that it would, and intended to, make payments to DRS in connection with the Craftmark Contract. Indeed, Craftmark made undisclosed payments to DRS in connection with its contract with IPC, despite the fact that Craftmark was not a produce supplier and the fact that Craftmark already had entered into a long-term contract with IPC that included certain volume commitments. Craftmark fraudulently concealed the payments it made to DRS.

38

199.   When entering into the Craftmark Contract, IPC relied on Craftmark's representation that Craftmark would not make any undisclosed payments to third parties in connection with the sale of Craftmark's products to IPC's Members.

200.   Had Craftmark disclosed to IPC that it intended to make payments to DRS, IPC would not have entered into the Craftmark Contract, nor would IPC have agreed to or paid the volume-based penalties included in the Craftmark Contract, through which Craftmark intended to recover the payments it was making to DRS.

201.   As a result of Craftmark's fraudulent representations, IPC and IPC's Members have suffered damages in an amount to be determined in trial, including the amounts of the contractual volume-based penalties paid to Craftmark, any overhead expenses included in the prices Craftmark charged for its bread, cookies, and flatbread that were then used to make payments, either directly or indirectly, to unauthorized and undisclosed third parties, including DRS, and any other costs caused by Craftmark's fraudulent representations to IPC when entering into the Craftmark Contract.

**COUNT VII**
**Breach of Fernandez Severance Agreement**
**(Against Defendant Jose Fernandez)**

202.   Plaintiff re-alleges the allegations set forth in paragraphs 1–20, 32–78, and 88–128 of this complaint as if fully set forth herein.

203.   On June 27, 2022, IPC and Fernandez executed the Fernandez Severance Agreement. A true and correct copy of the Fernandez Severance Agreement is attached as **Exhibit D**.

204.   In the Fernandez Severance Agreement, Fernandez affirmatively represented that he had "no knowledge of any violation of the law or any of IPC's policies or standards of conduct

39

by Employee or any of IPC's other employees or contractors during the court of [his] employment with IPC or otherwise."

205.    As described in paragraphs 100–110, given (i) Fernandez's position at IPC and the information to which he was privy, including questions from IPC's independent auditors and DRS consulting invoices being paid by vendors, (ii) his close personal relationship with Risi, and (iii) that he financially benefitted from the concealment of Risi's fraudulent kickback schemes, Fernandez was aware of, and helped conceal, those schemes.

206.    Fernandez's failure to disclose—indeed, his deliberate concealment of— the existence of the DRS Scheme was a breach of the representations Fernandez made in the Fernandez Severance Agreement.

207.    The Fernandez Severance Agreement expressly states: "[d]ue to the difficulty of measuring damages in the event of a breach by [Fernandez], the parties agree that, in the event of a breach by [Fernandez] of this Agreement, . . . [Fernandez] shall owe IPC liquidated damages in the amount of twenty-five percent (25%) of the total amount set forth in Section 3 above." The total amount set forth in Section 3 of the Fernandez Severance Agreement is $599,000. Thus, pursuant to the Fernandez Severance Agreement, Fernandez's breach of the Fernandez Severance Agreement has caused IPC damages in the amount of no less than $149,750 plus applicable interest.

208.    Further, the Fernandez Severance Agreement states: "It is agreed that in the event of any litigation or proceeding under this Agreement, except to the extent (and only to the extent) that such litigation or proceeding challenges the validity of this Agreement, the prevailing party shall be entitled to recover all costs and expenses incurred in such action or proceeding, including

reasonable attorney's fees." IPC, therefore, is contractually entitled to recover its prevailing party attorneys' fees and costs.

<u>COUNT VIII</u>
**Breach of Fiduciary Duty**
**(Against Defendants Janet Risi, Dennis Clabby, and Jose Fernandez)**

209.    Plaintiff re-alleges the allegations set forth in paragraphs 1–20 and 32–128 of this complaint as if fully set forth herein.

210.    As IPC's CEO from 1996 through December 31, 2021, Risi owed fiduciary duties to IPC and IPC's Members, including the duties of good faith, care, and loyalty. Indeed, as IPC's CEO, Risi was required to sign IPC's Conflict of Interest Policy, which made clear that all IPC Directors and Officers owed to IPC fiduciary duties of care and loyalty.

211.    Moreover, as the person responsible for approving master contracts that dictated the prices, terms, and conditions under which IPC's Members would pay for goods and services, Risi also owed fiduciary duties to IPC's Members to act in their best interests.

212.    As described in paragraphs 1–8, 18–31, and 35–115, for over 20 years, Risi orchestrated fraudulent kickback schemes, using DRS and SWS to solicit and receive kickbacks from the Vendor Defendants. DRS and SWS, in turn, shared those ill-gotten gains with Risi.

213.    Risi never disclosed the fraudulent kickback schemes to IPC, IPC's Board of Directors, or IPC's Members. In fact, Risi actively and deliberately concealed these schemes from IPC, IPC's Board of Directors and IPC's Members.

214.    Risi's fraudulent kickback schemes caused damages to IPC's Members by forcing them to pay higher prices for goods and services than IPC's Members otherwise would have paid in order to fund the kickbacks that were paid to DRS and SWS, a portion of which were ultimately funneled to Risi.

41

215.    By orchestrating the fraudulent schemes and receiving kickback payments, Risi acted for her own personal financial benefit and entirely adverse to the interests of IPC and IPC's Members, to whom she owed fiduciary duties.

216.    Any amounts given to Risi in the course of her illicit scheme belong to IPC and/or IPC's Members, not Risi.

217.    IPC and IPC's Members were damaged as a result of Risi's fraudulent kickback schemes and her failure to disclose those schemes to IPC, IPC's Board of Directors, or IPC's Members.

218.    As IPC's Treasurer and CFO, Fernandez owed fiduciary duties to IPC and IPC's Members, including the duties of good faith, care, and loyalty. Indeed, as an officer of IPC, Fernandez was required to sign IPC's Conflict of Interest Policy, which made clear that all IPC Directors and Officers owed to IPC fiduciary duties of care and loyalty.

219.    As described in paragraphs 100–110, given (i) Fernandez's position at IPC and the information to which he was privy, including questions from IPC's independent auditors and DRS consulting invoices being paid by vendors, (ii) his close personal relationship with Risi, and (iii) that he financially benefitted from the concealment of Risi's fraudulent kickback schemes, Fernandez was aware of, and helped conceal, those schemes.

220.    Fernandez failed to disclose Risi's kickback scheme to—and in fact, concealed Risi's kickback scheme from—IPC, IPC's Board of Directors, and IPC's Members. In doing so, Fernandez acted for his own personal financial benefit and entirely adverse to the interests of IPC and IPC's Members, to whom he owed fiduciary duties.

221.    Fernandez's failure to disclose the DRS Scheme allowed Risi to continue operating her illicit plan at the expense of IPC and IPC's Members.

222. Fernandez's failure to disclose Risi's illicit kickback schemes caused damages to IPC's Members by forcing them to continue paying higher prices for goods and services than IPC's Members otherwise would have paid for goods and services provided by the Vendor Defendants.

223. IPC and IPC's Members thus were damaged as a result of Fernandez's failure to disclose Risi's illicit kickback schemes to IPC, IPC's Board of Directors, or IPC's Members.

224. As a member of IPC's Executive Leadership Team, Clabby owed fiduciary duties to IPC, including the duties of good faith, care, and loyalty. Indeed, as IPC's Executive Vice President of Purchasing, Clabby was required to sign IPC's Conflict of Interest Policy, which made clear that all IPC Directors and Officers owed to IPC fiduciary duties of care and loyalty.

225. Moreover, Executive Vice President of Purchasing at IPC—the company responsible for negotiating master contracts that dictated the prices, terms, and conditions under which IPC's Members would pay for goods and services—Clabby also owed IPC's Members fiduciary duties to act in IPC's Members' best interests.

226. As described in paragraphs 19, 89–99, and 110, Clabby discovered Risi's scheme to have certain vendors pay kickbacks to DRS, a portion of which kickbacks Clabby believed eventually were shared with Risi.

227. Despite having several opportunities to do so—including attending multiple board meetings between learning of the DRS Scheme and his departure from the company in 2022—Clabby did not disclose the DRS Scheme to IPC, IPC's Board of Directors, or IPC's Members. It was only after IPC's new CEO confronted him that Clabby provided any information regarding the DRS Scheme, and even then, he took great pains to purposefully conceal not only his own involvement but also the true nature and scope of the scheme.

228.     In deliberately withholding information regarding the DRS Scheme, Clabby acted for his own personal financial benefit and entirely adverse to the interests of IPC and IPC's Members, to whom he owed fiduciary duties.

229.     Clabby's failure to disclose the DRS Scheme allowed Risi and other members of the DRS Scheme to continue operating their illicit plan at the expense of IPC and IPC's Members.

230.     Clabby's failure to disclose Risi's illicit DRS Scheme caused damages to IPC's Members by forcing them to continue paying higher prices for goods and services than IPC's Members otherwise would have paid for goods and services provided by certain vendors, including Defendants WLF and Lineage.

231.     IPC and IPC's Members thus were damaged as a result of Clabby's failure to disclose Risi's illicit DRS Scheme to IPC, IPC's Board of Directors, or IPC's Members.

232.     As described in paragraphs 7, 18–20, 38, 48–49, 52, 60, 67, 88–97, 100–102, 109–110, and 113 each of Defendants Risi, Clabby, and Fernandez fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of the Risi's, Clabby's, and Fernandez's concealment, IPC did not discover the existence of the kickback schemes until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

### COUNT IX
**Aiding and Abetting Fraud**
**(Against Defendants Janet Risi, Dennis Clabby, Jose Fernandez, DRS,**
**Daniel Spinazzola, Michael Spinazzola, West Liberty Foods, Lineage, Craftmark**
**Robert Cheney, Camille Fournier, Georgia Pacific, and Ecolab)**

233.     Plaintiff re-alleges the allegations set forth in paragraphs 1–128 of this complaint as if fully set forth herein.

234.     As described in paragraphs 1–27, 32–78, and 111–124, for more than 20 years, Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, WLF, and Lineage committed fraud by operating the DRS Scheme.

235.     Similarly, as described in paragraphs 1–18, 28–34, 79–87, 111–114, and 125–126, for more than 20 years, Defendants Risi, Cheney, Fournier, GP, and Ecolab committed fraud by making illicit kickback payments through SWS.

236.     Defendants Risi, DRS, D. Spinazzola, and M. Spinazzola each had knowledge of the fraud involving DRS as evidenced by the fact that they intentionally solicited, received and accepted the illegal kickbacks through the fraudulent kickback scheme.

237.     Defendants WLF, Lineage, and Craftmark each had knowledge of the fraud involving DRS as evidenced by the fact that they intentionally paid the illegal kickbacks to DRS under the guise of "commissions" and "fees," despite knowing that there was no legitimate business purpose to warrant making such payments to DRS.

238.     Defendants Risi, Cheney, and Fournier each had knowledge of the fraud involving SWS as evidenced by the fact that they intentionally solicited, received and accepted the illegal kickbacks through the fraudulent kickback scheme.

239.     Defendants GP and Ecolab each had knowledge of the fraud involving SWS as evidenced by the fact that they intentionally paid the illegal kickbacks to SWS under the guise of "commissions" and "fees," despite knowing that SWS had done nothing to deserve such payments.

240.     As described in paragraphs 89–97, Clabby had knowledge of the fraud involving DRS when Garrett sent Clabby the WLF/DRS/IPC Presentation, when Clabby subsequently confirmed the existence of the ongoing fraudulent scheme directly with various vendors, including

WLF, Lineage, and the successor to Predecessor Nonparty, as well as when Risi confirmed to Clabby that Craftmark also was making payments to DRS.

241.     As described in paragraphs 100–110, given (i) Fernandez's position at IPC and the information to which he was privy, including questions from IPC's independent auditors and DRS consulting invoices being paid by vendors, (ii) his close personal relationship with Risi, and (iii) that he financially benefitted from the concealment of Risi's fraudulent kickback schemes, Fernandez had knowledge of, and helped conceal, those schemes.

242.     Defendant Risi substantially aided others in the commission of the fraud by, among other things, using her position within IPC to paper the kickback scheme to make it appear to IPC, IPC's Board of Directors, and IPC's Members that each of the contracts through which the Vendor Defendants were charging the illicit kickbacks in their prices were valid, arms-length contracts and directing the Vendor Defendants to coordinate with DRS and SWS regarding the process of paying the kickbacks.

243.     Defendants DRS, D. Spinazzola, M. Spinazzola substantially aided others in the commission of the fraud involving DRS by, among other things, charging WLF, Lineage, and Craftmark phantom "fees" and "commissions" and funneling those illicit payments through DRS to make them appear legitimate.

244.     Defendants WLF, Lineage, and Craftmark substantially aided others in the commission of the fraud involving DRS by, among other things, working with the principals of DRS on the process of making the kickback payments, making the kickback payments to DRS, and passing the cost of the kickback payments through to IPC's Members in the prices charged to IPC's Members for WLF's, Lineage's, and Craftmark's respective products and services.

245.     Defendants Cheney, and Fournier substantially aided others in the commission of the fraud involving SWS by, among other things, charging GP and Ecolab phantom "fees" and "commissions" and funneling those illicit payments through SWS to make them appear legitimate.

246.     Defendants GP and Ecolab substantially aided others in the commission of the fraud involving SWS by, among other things, working with the principals of SWS on the process of making the kickback payments, making the kickback payments to SWS, and passing the cost of those kickback payments through to IPC's Members in the prices charged to IPC's Members for their respective products and services.

247.     Defendants Clabby and Fernandez substantially aided others in the commission of the frauds involving DRS by, among other things, failing to disclose, or delaying the disclosure of, their knowledge of Risi's kickback scheme, despite having fiduciary duties to IPC, IPC's Board of Directors, and IPC's Members to disclose those kickback schemes, which failure to disclose and/or delay in disclosing allowed the other Defendants to continue perpetrating the fraud for an extended period of time.

248.     As described in paragraphs 7, 18–20, 38, 48–49, 52, 60, 67, 82–97, 100–102, 109–113, and 125–126, each of the Defendants fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of Defendants' concealment, IPC did not discover the conduct alleged herein until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

<u>COUNT X</u>
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Defendants Janet Risi, Dennis Clabby, Jose Fernandez, DRS,**
**Daniel Spinazzola, Michael Spinazzola, West Liberty Foods, Lineage, Craftmark,**
**Robert Cheney, Camille Fournier, Georgia Pacific, and Ecolab)**

249.   Plaintiff re-alleges the allegations set forth in paragraphs 1–128 of this complaint as if fully set forth herein.

250.   As described in paragraphs 210–211, 218, and 224–225, Defendants Risi, Clabby, and Fernandez each owed fiduciary duties to IPC. Further, given their positions at IPC, Defendants Risi and Clabby also each owed IPC's Members fiduciary duties to act in IPC's Members' best interests.

251.   As described in paragraphs 212–217, 219–223, and 226–231, each of Defendants Risi, Clabby, and Fernandez breached the fiduciary duties he or she each owed to IPC and IPC's Members.

252.   Defendants DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, Craftmark, Cheney, Fournier, GP, and Ecolab were each aware that Defendant Risi was IPC's CEO, and thus knew that, in that role, Risi owed fiduciary duties to IPC and IPC's Members.

253.   Given their respective roles at IPC, Defendants Risi, Clabby, and Fernandez each knew that the other two owed fiduciary duties to IPC and IPC's Members.

254.   Each of Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, Craftmark, Clabby, and Fernandez had knowledge of the fraudulent kickback scheme involving DRS and that the kickback scheme involving DRS was not being disclosed to IPC, IPC's Board of Directors, or IPC's Members.

255.   Each of Defendants Risi, Cheney, Fournier, GP, and Ecolab had knowledge of the fraudulent kickback scheme involving SWS and that the kickback scheme involving SWS was not being disclosed to IPC, IPC's Board of Directors, or IPC's Members.

256.    As set forth in paragraphs 2–7, 21–27, 35–78, and 236–237, each of Defendants DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, and Craftmark substantially assisted or encouraged the breach of fiduciary duties by Defendants Risi, Clabby, and Fernandez through the actions each Defendant took in aid of the fraudulent scheme involving DRS.

257.    As set forth in paragraphs 2–7, 28–31, 79–87, and 245–246, each of Defendants Cheney, Fournier, GP, and Ecolab substantially assisted or encouraged the breach of fiduciary duties by Defendant Risi through the actions each Defendant took in aid of the fraudulent scheme involving SWS.

258.    As set forth in paragraphs 7, 18–20, 88–128 and 132, each of Defendants Risi, Clabby and Fernandez substantially assisted or encouraged the breach of fiduciary duties by one another through the actions each Defendant took in aid of the fraudulent schemes involving DRS.

259.    As described in paragraphs 7, 18–20, 38, 48–49, 52, 60, 67, 82–97, 100–102, 109–113, and 125–126, each of the Defendants fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of Defendants' concealment, IPC did not discover the conduct alleged herein until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

## COUNT XI
### Unjust Enrichment
**(Against Defendants Janet Risi, DRS, Daniel Spinazzola, Michael Spinazzola, Robert Cheney, Camille Fournier, Dennis Clabby, and Jose Fernandez)**

260.    Plaintiff re-alleges the allegations set forth in paragraphs 1–128 of this complaint as if fully set forth herein.

261.     Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, Cheney, and Fournier received the ill-gotten gains of more than $200 million in kickbacks that had been fraudulently charged to IPC's Members on the goods and services provided by the Vendor Defendants.

262.     Risi, DRS, D. Spinazzola, M. Spinazzola, SWS, Cheney, and Fournier knowingly induced the Vendor Defendants to charge IPC's Members these unearned and illegitimate "brokerage fees" and then pay them to DRS or SWS. DRS and SWS then paid kickbacks to Risi out of these "brokerage fees." None of the kickback payments have been returned to IPC or to IPC's Members.

263.     Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, Cheney, and Fournier had knowledge of the benefits conferred by IPC's Members and voluntarily accepted and retained the benefits conferred on each of them. Had they known the true facts surrounding the conduct of Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, Cheney, and Fournier, IPC and IPC's Members would have expected remuneration.

264.     For example, if IPC and IPC's members had been aware of the kickbacks WLF was paying as part of the DRS Enterprise between 2005 and 2019, IPC's Members would have expected to be charged and/or pay at least $172 million less for WLF's products during that period—i.e., they would not have expected to pay for kickbacks that were illicitly charged as "brokerage fees."

265.     Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, Cheney, and Fournier retained the benefits of these improper kickbacks disguised as "brokerage fees" despite there being no legitimate basis for those payments.

266.     It would be inequitable for Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, and Fournier to retain the benefit of the aforementioned kickbacks, or any portion thereof, that they fraudulently received.

267.    Thus, IPC's Members are entitled to recover the amount by which Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, Cheney, and Fournier were unjustly enriched at IPC's Members' expense.

268.    Additionally, Defendants Risi, Clabby, and Fernandez each received substantial compensation in the form of salaries, bonuses, and benefits from IPC during their period of disloyalty to IPC that ultimately amounted to ill-gotten gains tied to and derived from the operation of these unlawful, disloyal, and fraudulent activities and schemes at the expense of IPC and IPC's Members.

269.    IPC conferred the benefit of the substantial compensation Defendants Risi, Clabby, and Fernandez received in the form of salaries, bonuses, and benefits from IPC during their period of disloyalty to IPC.

270.    Defendants Risi, Clabby, and Fernandez had knowledge of the benefits conferred by IPC in the form of salaries, bonuses, and benefits from IPC during their period of disloyalty to IPC.

271.    Had IPC known the true facts surrounding the conduct of Defendants Risi, Clabby, and Fernandez, IPC would not have provided the salaries, bonuses, and benefits received by Defendants Risi, Clabby, and Fernandez, and would have expected Defendants Risi, Clabby, and Fernandez to return those amounts.

272.    It would be inequitable for Defendants Risi, Clabby, and Fernandez to retain the benefits conferred on them by IPC given their operation of these unlawful, disloyal, and fraudulent activities and schemes at the expense of IPC and IPC's Members.

273.    As described in paragraphs 18–20, 38, 82–97, 100–102, and 109–113, each of Defendants Risi, DRS, D. Spinazzola, M. Spinazzola, Cheney, Fournier, Clabby, and Fernandez

fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of their concealment, IPC did not discover the conduct alleged herein until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

**COUNT XII**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**(Against Defendants DRS, Daniel Spinazzola, Michael Spinazzola, West Liberty Foods, Lineage, Craftmark, Robert Cheney, Camille Fournier, Georgia Pacific, and Ecolab)**

274.    Plaintiff re-alleges the allegations set forth in paragraphs 1–128 of this complaint as if fully set forth herein.

275.    For more than 20 years, Defendants DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, Craftmark, Cheney, Fournier, GP, and Ecolab participated in illicit kickback schemes at the expense of IPC's Members.

276.    As part of one of the kickback schemes, Defendants DRS, D. Spinazzola, and M. Spinazzola solicited improper kickback payments from Defendants WLF, Lineage, and Craftmark, which WLF, Lineage, and Craftmark then paid to DRS under the guise of "fees" and "commissions," despite there being no legitimate business purpose for WLF, Lineage, or Craftmark to make such payments to DRS.

277.    Defendants WLF, Lineage, and Craftmark then passed through the cost of the kickbacks paid to DRS by artificially inflating the prices that were charged to IPC's Members for the goods and services provided by WLF, Lineage, and Craftmark.

278.    The kickback scheme involving DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, and Craftmark constitutes an unfair or deceptive act or practice in the conduct of trade or

commerce because the kickback scheme deceived IPC's Members into paying inflated prices that were charged by WLF, Lineage, and Craftmark for their respective goods and services.

279.    The kickback scheme involving DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, and Craftmark caused IPC's Members to unknowingly pay increased prices charged by WLF, Lineage, and Craftmark for their respective goods and services.

280.    The portion of the prices paid by IPC's Members that were inflated due to the kickback scheme involving DRS, D. Spinazzola, M. Spinazzola, WLF, Lineage, and Craftmark constitute actual damages.

281.    As part of another kickback scheme, Defendants Cheney, and Fournier solicited improper kickback payments from Defendants GP and Ecolab, which GP and Ecolab then paid to SWS under the guise of "fees," regardless of whether SWS provided redistribution services for the products subject to the "fees."

282.    Defendants GP and Ecolab then passed through the cost of the kickbacks paid to SWS by artificially inflating the prices that were charged to IPC's Members for the products provided by GP and Ecolab.

283.    The kickback scheme involving Cheney, Fournier, GP, and Ecolab constitutes an unfair or deceptive act or practice in the conduct of trade or commerce because the scheme deceived IPC's Members into paying inflated prices that were charged by GP and Ecolab for their respective products.

284.    The kickback scheme involving Cheney, Fournier, GP, and Ecolab caused IPC's Members to unknowing pay increased prices that were charged by GP and Ecolab for their respective products.

285.    The portion of the prices paid by IPC's Members that were inflated due to the kickback scheme involving Cheney, Fournier, GP, and Ecolab constitute actual damages.

286.    As described in paragraphs 38, 48–49, 52, 60, 67, 82–86, 109–113, and 125–126, each of the Defendants fraudulently concealed from IPC material facts underlying this cause of action by making material misrepresentations and intentional nondisclosures about their conduct that hid and delayed IPC's discovery of the unlawful activity. As a result of Defendants' concealment, IPC did not discover the conduct alleged herein until after Defendant Risi left IPC, and IPC did not discover the full extent of the conduct alleged herein until after Defendants Risi, Clabby, and Fernandez had all departed from IPC.

## JURY DEMAND

287.    Plaintiff Independent Purchasing Cooperative, Inc. hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

288.    WHEREFORE, Plaintiff, on behalf of its members, demands the following relief:

- Compensatory damages;

- Punitive damages;

- Treble damages as authorized by Fla. Stat. § 772.104(1);

- Rescission of the Risi Separation Agreement;

- An order requiring Defendants to account for, forfeit, and disgorge all ill-gotten gains obtained as a result of their unlawful and disloyal conduct, including but not limited to any profits, compensation, salaries, benefits, or advantages derived from the conduct that have unjustly enriched the Defendants;

- Pre- and post-judgment interest;

- Attorneys' fees and costs; and

- Such other relief as the Court deems just and proper.

Dated: November 18, 2025

Respectfully submitted,

By: */s/ Melissa C. Pallett-Vasquez*
Melissa C. Pallett-Vasquez
Fla. Bar No.:  0715816
Matthew W. Tieman
Fla. Bar No.:  1044909
Tabitha P. Cohen
Florida Bar No.: 1065234
**BILZIN SUMBERG BAENA PRICE
& AXELROD LLP**
1450 Brickell Avenue, Suite 2300
Miami, Florida 33131-3456
Telephone: (305) 350-2393
Facsimile:  (305) 374-7593
Email:  mpallett@bilzin.com
Email:  mtieman@bilzin.com
E-mail: tcohen@bilzin.com
Email:  eservice@bilzin.com

George W. "Bill" Morrison (*pro hac vice* forthcoming)
Samara Taper (*pro hac vice* forthcoming)
**HAYNES AND BOONE, LLP**
2801 N. Harwood St., Suite 2300
Dallas, Texas 75201
214.651.5000 (phone)
214.651.5940 (fax)
bill.morrison@haynesboone.com
samara.taper@haynesboone.com

*Counsel for Plaintiff Independent Purchasing
Cooperative, Inc.*